**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**


UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
              vs               )      No. 23-CR-183-JFH
                               )
LANDON JOE BLACK,              )
                               )
                 Defendant.    )
                               )


TRANSCRIPT OF
DETENTION HEARING
BEFORE THE HONORABLE D. EDWARD SNOW
UNITED STATES MAGISTRATE JUDGE
OCTOBER 30, 2023


A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT
Anthony Marek, Esq.
United States Attorney's Office
520 Denison Ave.
Muskogee, Oklahoma 74401


ON BEHALF OF THE DEFENDANT
Jarred Jennings, Esq.
Federal Public Defender - Muskogee
112 N. 7th Street
Muskogee, Oklahoma 74401


Shelley Ottwell, RPR, CSR
United States Stenographer
P.O. Box 607
Muskogee, Oklahoma 74402


UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

**P R O C E E D I N G S**

(RECORDING COMMENCED AT 9:29 a.m.)

1
2
3            COURTROOM DEPUTY:  The court calls case
4    CR-23-183-JFH, United States of America v. Landon Joe
5    Black.
6            THE COURT:  Will the parties enter their
7    appearance, please?
8            MR. MAREK:  Good morning, Your Honor.  Anthony
9    Marek for the United States.
10           THE COURT:  Hello.  Good morning, Mr. Marek.
11   Welcome back to your courtroom.
12           MR. JENNINGS:  Jarred Jennings on behalf of
13   Landon Black, who is present and in custody, Your Honor.
14           THE COURT:  Welcome back to your courtroom,
15   Mr. Jennings.
16           MR. JENNINGS:  Thank you, Your Honor.
17           THE COURT:  All right.  Mr. Jennings, I show
18   that we're here this morning on a detention hearing.  Is
19   that what you believe we're here to do today?
20           MR. JENNINGS:  Yes, Your Honor.
21           THE COURT:  And, Mr. Marek, do you concur?
22           MR. MAREK:  Yes, sir.
23           THE COURT:  All right.  Is there anything we
24   need to do before we hear evidence on this matter?
25       Mr. Marek?

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

```
 1            MR. MAREK:  Not from the government, Your Honor.
 2            THE COURT:  All right.  Mr. Jennings, anything
 3  preliminary to hearing of evidence in this matter?
 4            MR. JENNINGS:  No, Your Honor.
 5            THE COURT:  All right.  This matter is set
 6  before the Court for a detention hearing.  For the record,
 7  the defendant is in custody and he's appearing in person.
 8        Mr. Black, the purpose of this hearing is to
 9  determine whether there are conditions of release that
10  will reasonably assure your appearance and the safety of
11  others in the community or whether you must be detained
12  pending trial.
13        Mr. Marek, are there any crime victims who wish to be
14  heard today?
15            MR. MAREK:  No, Your Honor.
16            THE COURT:  Are both parties ready to proceed?
17            MR. MAREK:  Government is ready, Your Honor.
18            MR. JENNINGS:  Yes, Your Honor.
19            THE COURT:  All right.  Government, you may
20  present evidence.
21            MR. MAREK:  The United States calls Special
22  Agent Austin McCourt.
23            THE COURT:  All right.  Agent McCourt if you'll
24  come up here.  She'll swear you in.
25        Give me just a moment, Mr. Marek.
```

1    All right, sir, you may inquire.

2         MR. MAREK:   Thank you, Your Honor.

3                   AUSTIN MCCOURT

4    having been first duly sworn, testifies as follows:

5                   **DIRECT EXAMINATION**

6    **BY MR. MAREK:**

7    Q.   Agent McCourt, please state and spell your name.

8    A.   Austin McCourt, A-U-S-T-I-N  M-C-C-O-U-R-T.

9    Q.   Where and how are you employed, sir?

10   A.   I am a Special Agent with the Federal Bureau of

11   Investigation in the Eastern District of Oklahoma.

12   Q.   Are you familiar with an investigation into a Landon

13   Joe Black?

14   A.   Yes.

15   Q.   Did this investigation involve a particular website

16   on the Tor network, otherwise known as the dark web?

17   A.   Yes.

18   Q.   Would you please describe the website without naming

19   it?

20   A.   The website is essentially a forum of a discussion

21   group and sexual interest in prepubescent teenage boys.

22   It's a site where you can exchange child sexual abuse

23   material such as images and videos.

24   Q.   To be clear, the website facilitated an interest in

25   prepubescent and pubescent boys.

1    A.    Yes, sir.

2    Q.    How did the users on this website identify

3    themselves?

4    A.    Users would have a username, password and they would

5    create a profile on the website.

6    Q.    Now that we have a little bit of background on the

7    website, how did the investigation into Landon Black

8    specifically begin?

9    A.    A foreign law enforcement entity informed us that

10   there was an IP address that had frequented the website

11   that was based in the United States.

12   Q.    Before the foreign law enforcement source, was that

13   IP address tied to a particular user name of the website?

14   A.    Yes.  It was tied to the user name The Revenant.

15   Q.    Was any information able to be discovered about which

16   Internet service provider in the United States serviced

17   that IP address?

18   A.    Yes.  We were able to identify the Internet service

19   provider as OzarksGo.

20           THE COURT:  I'm sorry.  Can you say that again?

21   Ozark?

22           THE WITNESS:  OzarksGo.

23           THE COURT:  Okay.

24   Q.    (BY MR. MAREK) And that would be O-Z-A-R-K-S-G-O; is

25   that correct?

1    A.    Yes.

2    Q.    And the particular user named "The Revenant" on the

3    website, what was the significance of that particular

4    user?

5    A.    That user had several posts where he had stated that

6    he had baited underage minors, underage males, into

7    eliciting child sexual abuse material.

8    Q.    So there's several postings in which the user had

9    claimed that he had baited certain people.

10         What else did the posts include?

11   A.    They included links to images and videos of child

12   sexual abuse material, as well as descriptors of victims

13   that were baited.

14   Q.    If a user were on that website and followed those

15   links, what would happen?

16   A.    It would take the user to sexual abuse material to be

17   downloaded.

18   Q.    You used the term "baiting."  Can you describe your

19   understanding of what this particular user meant when the

20   user used the term "baiting"?

21   A.    Baiting is essentially acting as a female minor on

22   social media for the purposes of eliciting sexual videos

23   and images from male minors.

24   Q.    According to your training and experience and your

25   knowledge of this case, does the word "baiting" imply an

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1    element of deception?

2    A.    Yes.

3    Q.    What steps did the FBI take after receiving the

4    information from the foreign law enforcement source about

5    that IP address?

6    A.    The FBI subpenaed the Internet service provider

7    OzarksGo for the purpose of getting subscriber information

8    for that IP address, which led us to 1215 Ridge Drive in

9    Stilwell, Oklahoma.

10   Q.    That's in the Eastern District of Oklahoma, correct?

11   A.    Yes, sir.

12   Q.    Did the subscriber information provided by OzarksGo

13   indicate the name of the subscriber?

14   A.    The subscriber was Sheila Black, who we found out

15   later is the mother of Landon Black.

16   Q.    Does the FBI have any way of confirming whether or

17   not a particular Internet subscriber is using the dark web

18   or the TOR network?

19   A.    Yes.  We were able to confirm that there was dark web

20   traffic coming from the Black address, Black residence.

21   Q.    And what next steps were taken in the investigation?

22   A.    The FBI executed a search warrant for the 1215 Ridge

23   Drive address in Stilwell where we seized computers,

24   laptops, cell phones, flash drives.  We also submitted a

25   search warrant for Landon Black's iCloud account.

```
 1   Q.    Were there 2703D court orders obtained for Google and
 2   Apple as well?
 3   A.    Yes, there were.
 4   Q.    Those were for accounts that the FBI believed to have
 5   been controlled by Black.
 6   A.    Yes.
 7   Q.    Did the information that you received as a result of
 8   the search warrants and court orders provide you with any
 9   relevant information?
10   A.    Yes.   There was a substantial amount of evidence
11   linking Landon Black to the user name, "The Revenant."
12         There was a text document that had user name and
13   password information for The Revenant account.
14         There was also -- The Revenant stored child sexual
15   abuse material on another website on the dark web and
16   login information and password information was found for
17   that website too -- website as well as on Black's devices.
18   Q.    Have you reviewed the indictment in this case?
19   A.    Yes, I have.
20   Q.    And Counts One and Two refer to what we colloquially
21   call Production of Child Pornography.   Would you agree
22   with that?
23   A.    Yes.
24   Q.    And these counts refer to Minor Victim One and Minor
25   Victim Two respectively?
```

1   A.   Yes.

2   Q.   Was the FBI able to identify and locate Minor Victim

3   One and Minor Victim Two?

4   A.   Yes.

5   Q.   Were they both forensically interviewed?

6   A.   Yes.

7   Q.   Please, summarize what Minor Victim One disclosed in

8   his forensic interview.

9   A.   Minor Victim One stated that he was catfished via

10  Instagram by an account supposedly ran by an Emily Jansen

11  when he was approximately 14 years old.  He stated that he

12  sent sexual imagery to nobody else but Emily Jansen.  He

13  was able to identify the images that he sent to that

14  account on Black's devices.

15  Q.   Please summarize what Minor Victim Two disclosed in

16  his forensic interview.

17  A.   Minor Victim Two had a similar catfishing story via

18  Snapchat where he was baited by a Jenna Whitely.  He, too,

19  had also sent sexual imagery to no one else but the Jenna

20  Whitely Snapchat, and he was able to identify that sexual

21  imagery later on Black's devices.

22  Q.   Was Minor Victim Two able to say how old he was when

23  he sent the sexually explicit images of himself to Jenna?

24  A.   Approximately 13.

25  Q.   Was child pornography depicting Minor Victim One and

1   Minor Victim Two found on Black's devices?

2   A.   Yes.

3   Q.   When Black's devices were viewed, was any evidence

4   found to suggest that Black controlled social media

5   accounts using the pseudonym Emily Jansen?

6   Q.   There was login and password information for the

7   Emily Jansen account as well as the profile picture used

8   on the account that was found on Black's devices as well.

9   Q.   And the profile picture that you just described, it

10   was a Snapchat profile screenshot; is that correct?

11   A.   Yes, that's correct.

12   Q.   Was there also Instagram references to an Emily

13   pseudonym Instagram account on Black's devices?

14   A.   Yes, there was.

15   Q.   Emily Jansen was the pseudonym that Minor Victim One

16   specifically referred to in his interview; is that

17   correct?

18   A.   That's correct.

19   Q.   The screenshot that you described of the Snapchat

20   profile, was there anything significant about the

21   screenshot itself?

22      In other words, is that screenshot of the Snapchat

23   account, is that what the user logged into that account

24   would have seen?

25   A.   Yes.

1   Q.   Was there any evidence found on Black's devices or

2   cloud accounts to suggest that he controlled social media

3   with the pseudonym Jenna?

4   A.   Yes.  Again, there was log-in information found.  The

5   password and user name for that information were found in

6   Landon Black's Apple key chain.  The email attached to

7   that specific Snapchat account also came back to Landon

8   Black's iCloud email.

9   Q.   That iCloud email being landonlol@iCloud.com?

10  A.   Yes.

11  Q.   Was there a document found in Black's devices or

12  iCloud account that referred to the name "Jenna?".

13  A.   Yes.  There was a document called, Girls List Names

14  that had the name Jenna Whitely.

15  Q.   And I think you said earlier there were references to

16  a Snapchat account using the name "Jenna" on Black's

17  devices and cloud accounts.

18  A.   Yes.

19  Q.   And "Jenna" was the pseudonym that was disclosed by

20  Minor Victim Two in his forensic interview?

21  A.   Yes.

22  Q.   Now, Count Three of the indictment is advertisement

23  of child pornography.  Do you agree with that?

24  A.   Yes.

25  Q.   And the conduct targeted by Count Three are certain

1   posts that The Revenant made on this dark web website; is

2   that correct?

3   A.   Yes.

4   Q.   And you testified earlier that there was evidence

5   located on the defendant's devices suggesting that The

6   Revenant is, in fact, Landon Black or was; is that

7   correct?

8   A.   Yes.

9   Q.   Could you describe when you and I use the term

10  "post", what does a post look like?  How would you

11  describe what a post is on this website?

12  A.   On that website, a post is going to have links to

13  videos and images of child sexual abuse material.  It's

14  going to have descriptors about the victim itself,

15  themselves, regarding their age and the manner in which

16  they were baited.

17  Q.   Were there occasions when The Revenant in these posts

18  would claim to have baited the victims whose sexually

19  explicit material appeared in the links on that post?

20  A.   Yes.

21  Q.   And can any member of this website follow these links

22  that The Revenant posted and download child sexually

23  abusive material of these victims?

24  A.   Yes.

25  Q.   Count Four is possession of child pornography.

A.   Yes.

Q.   In addition to the child pornography found on Black's devices and cloud accounts concerning the victims mentioned in Counts One and Two, was there additional child pornography or child sexually abusive material found on Black's devices and cloud accounts?

A.   There was an additional folder found called "The Vault," which contained a significant amount of child sexual abuse material that was likely being traded.  That was not necessarily the same material that he had obtained via baiting in previous . . .

Q.   In other words, the child pornography that was found in The Vault folder is separate from Counts One, Two, and Three; is that correct?

A.   Correct.

Q.   Have you been inside the Black residence at 1215 Ridge Drive in Stilwell, Oklahoma?

A.   Yes.

Q.   Have you been inside Landon Black's bedroom?

A.   Yes.

Q.   Did you observe any weapons in the bedroom?

A.   In his bedroom we found two firearms.  They were the AR-15-style firearm, as well as ammunition.  One of the firearms was out in the open, and the other firearm was found in a black, soft-shell gun case.

1   Q.   The first weapon is an AR-15 style; is that correct?

2   A.   That's correct.

3   Q.   And what did the second weapon look like to you?

4   A.   I would still call it an AR-15 or AR-10-style weapon.

5   Q.   For approximately how long has Landon Black been

6   suspected of possessing or distributing child pornography?

7   A.   The foreign law enforcement entity that gave us that

8   IP address we found that IP address was subject to

9   approximately 14 cyber tips dating back to 2019.

10  Q.   If you were to summarize the conduct involved in

11  these cyber tipline reports were they possession or were

12  they distribution?  How would you summarize most of them?

13      Is there anything that would refresh your

14  recollection along those lines?

15  A.   Yes.  May I check my notes?

16  Q.   Do you have access to the search warrant affidavit on

17  the stand?

18  A.   Not on the stand.

19          MR. MAREK:  May I approach the witness, Your

20  Honor?

21          THE COURT:  Yes, you may.

22  Q.   (BY MR. MAREK) Agent McCourt, if you could just read

23  those to yourself and look back up to me when you're

24  finished.

25      Agent McCourt, we don't need to go into the specifics

1    of each report, but how would you summarize what most of

2    the activity was?

3    A.    Primarily possession and distribution of child sexual

4    abuse material.

5    Q.    And I forgot to ask, was your recollection refreshed

6    by reviewing that portion of the affidavit?

7    A.    Yes, it was.

8    Q.    In your review of Black's electronic devices and the

9    returns from Apple and Google, did you see the term

10   "Operation Red Lucid" used?

11   A.    Yes.

12   Q.    Where exactly did you see that term?

13   A.    It was referenced in Black's Apple iCloud account as

14   well as his notes.

15   Q.    We referred earlier to a landonlol@icloud.com.  Is

16   that the same account that we referred to earlier which

17   was the Operation Red Lucid referenced?

18   A.    Yes.

19   Q.    What was your understanding of what Operation Red

20   Lucid was?

21   A.    Operation Red Lucid was the stalking of a minor male

22   online.

23   Q.    When you say stalking, could you elaborate on what

24   you mean?

25   A.    The information found on the specific target was his

1    name, address, social media contacts, personal contacts,
2    names and birthdays of close family members, including
3    parents and siblings; information about the school
4    district that the potential target was in; pictures of the
5    school itself, including an overhead map of the campus;
6    documentation about the target's class schedule and
7    sporting event schedule.
8    Q.   What was the last thing that you said?  I'm sorry.
9    A.   Documents about the target's class schedule, grade,
10   and sporting event schedule.
11        THE COURT:  Let's go ahead and take just a brief
12   break for a second.  Can I get you to turn it up if we
13   can?
14        All right.  Agent, I'm going to ask you to speak up.
15   What's happened is, is that the record should reflect that
16   we've had the overhead heater come on and it's making it
17   difficult for us to hear you, so I want you to really lean
18   into that mic.
19        As a matter of fact, there's a man sitting in the
20   back of the courtroom there that's wearing a gray shirt.
21   I want you to pretend that microphone doesn't even work
22   and he should be able to hear you without the benefit of
23   the microphone and so let's really kind of talk louder.
24   Of course, they turned it off at this moment, but let's
25   assume that it's going to come back on at any time.

 1              THE WITNESS:  Yes, sir.

 2              MR. MAREK:  May I proceed, Your Honor?

 3              THE COURT:  Please.

 4    Q.   (BY MR. MAREK) You mentioned that included in the

 5    information found about this particular -- I think you

 6    used the word "target."  That is the teenage boy that

 7    appeared to be the subject of Operation Red Lucid; is that

 8    right?

 9    A.   That's correct.

10    Q.   That's what you mean when you say "target"?

11    A.   Yes.

12    Q.   And all this information that was found about this

13    one child was on Landon Black's iCloud account.  In what

14    format did you review that information?

15         How was that stored on his iCloud account?

16    A.   It was a text document.

17    Q.   Within the Operation Red Lucid information, was there

18    any information that led you or other law enforcement to

19    become concerned that Mr. Black was planning on making

20    contact with that child?

21    A.   The term "Red Lucid plan" was referenced multiple

22    times in the document.  There was also a piece in the

23    document stating step-by-step instructions that whoever

24    carried out the task was to get in make-up that resembled

25    an old man several states away from the target state and

1    then rent a U-Haul in the target state.

2    Q.    And moving on from that Operation Red Lucid

3    information, did you find other information in the

4    defendant's accounts to suggest that he had a similar

5    obsession with any other children?

6    A.    Yes, there were other similar documents.  In one

7    instance, there was another underage male, who we found

8    name, birthday, address information, father's email and

9    contact information, as well as even the amount of rent

10   that was being paid at the property of the target.

11   Q.    Did you have a chance to review any information that

12   appeared to be autobiographical in nature where Mr. Black

13   was describing himself or his interests?

14   A.    Yes.

15   Q.    Could you describe that?

16   A.    There was a document where Landon referred to --

17   Landon had stated that he believed he was a pedophile at

18   the age of 15.

19          MR. MAREK:  Nothing further for the agent at

20   this time, Your Honor.

21          Thank you.

22          THE COURT:  All right.  I had a couple of

23   questions.  I want to make sure I have the record.  Can

24   you just stay there, Mr. Marek?  You may have some

25   follow-up questions before Mr. Jennings has an opportunity

1    to cross-examine.

2         So when we talked about the Minor Victim One and

3    Minor Victim Two, you indicated that they were 14 and 13

4    years old respectively at the time that they had sent

5    these images.

6         How old were they when they were interviewed?

7              THE WITNESS:  I do not recall.

8              THE COURT:  Okay.  What I'm trying to get at was

9    how old was the defendant at the time that these minor

10   images were apparently received from the 14 and 13 year

11   old?  I note that the indictment starts with April of

12   2021.

13             THE WITNESS:  I don't recall that information at

14   this time.

15             THE COURT:  Mr. Marek, do you have anything that

16   would refresh his memory as to that?

17             MR. MAREK:  One second please, Your Honor.

18        Not among the documents I have with me.  Possibly --

19   possibly on my phone, but nothing that I can print out and

20   that I can show you.

21             THE COURT:  Okay.  And then I want to make sure

22   that I understand because this was loud behind me,

23   Mr. Marek.  This is more of a question for you, but you

24   may inquire of the agent.  I'm a little lost on Count

25   Three as to whether or not the advertisement posted links

1   to videos or pictures of Minor Victim One or Minor Victim

2   Two.

3         MR. MAREK:  Could I ask a few follow-up

4   questions?

5         THE COURT:  Please, if you would, sir.

6                 **DIRECT EXAMINATION CONT'D**

7   BY MR. MAREK:

8   Q.   Again, Agent McCourt, you've reviewed the indictment,

9   correct?

10  A.   Correct.

11  Q.   Have you also -- are you familiar with Minor Victims

12  Three, Four, and Five as far as the fact that they exist?

13  A.   Yes.

14  Q.   And are Minor Victims Three, Four, and Five children

15  who have been identified and located by the FBI?

16  A.   Yes.

17  Q.   Are Minor Victims Three, Four, and Five -- were each

18  of them subjected to forensic interviews?

19  A.   Yes.

20  Q.   And each of those -- they're all boys; is that

21  correct?

22  A.   Yes.

23  Q.   Did each of those boys disclose having disseminated

24  child sexual abuse material of themselves?

25  A.   Yes.

```
 1   Q.   Is it your testimony that the advertisement that is
 2   charged in Count Three charges posts that The Revenant
 3   made disseminating or making available for download child
 4   sexually abusive material featuring Minor Victims Three,
 5   Four, and Five?
 6   A.   Yes.
 7   Q.   I don't know if I've asked this before, but did each
 8   of those boys disclose that they were under the age of 18
 9   when they sent those images?
10   A.   I do not recall that right now.
11   Q.   In any case, Minor Victims Three, Four, and Five as
12   well as -- Minor Victims Three, Four, and Five as well as
13   another victim that was the subject in Count Three; is
14   that correct?
15   A.   That's correct.
16        MR. MAREK:   I think, Your Honor, those are the
17   follow-up questions that I have on Count Three.
18        THE COURT:   All right.   Mr. Marek, what I was
19   getting at is I want to know, did he ever attempt to
20   distribute Minor Victims One or Minor Victims Two either
21   CSAM material in the form of digital images or videos, if
22   your agent knows.
23        THE WITNESS:   Regarding MV1 and MV2, I do not
24   recall at this time if he ever attempted to disseminate
25   that material.
```

 1           THE COURT:  All right.  And then with respect to
 2   Red Lucid, I'm not sure I'm saying it right again, my
 3   apologies.  I'm just saying "Red Lucid," and you can
 4   correct me at the appropriate time.  I want to know when
 5   this document was created if you can tell me what age the
 6   defendant was at the time that he created this document?
 7   If there's any circumstantial evidence that you can point
 8   to or any solid day/time frame or any file creation date.
 9           MR. MAREK:  Do you recall whether there was a
10   create date on the iCloud note in which you found the
11   Operation Red Lucid information?
12           THE WITNESS:  I'm sure there is.  I just don't
13   recall what that date is at this time.
14   Q.   (BY MR. MAREK) Were there any circumstantial factors
15   that suggested how old the defendant was or whether the
16   defendant was an adult or how long ago the information
17   about the child that was the subject of Operation Red
18   Lucid was gathered?
19   A.   Not that I could recall definitely at this time.
20           THE COURT:  All right.  Mr. Marek, I think I
21   gave you the follow-up questions based on the Court's
22   questions, but if there's anything else that you would
23   like to follow up with him on, I'm sure -- you're welcome.
24   I may have opened the door or two for you, so if there's
25   anything else that you have of this witness, please

```
 1    inquire.
 2              MR. MAREK:  Not for the moment, Your Honor.
 3    Thank you.
 4              THE COURT:  All right.  May the witness be
 5    cross-examined at this time?  Do you pass the witness?
 6              MR. MAREK:  Yes, Your Honor.
 7              THE COURT:  Mr. Jennings, you may cross-examine,
 8    sir.
 9              MR. JENNINGS:  If I may have a brief moment,
10    Your Honor.
11              THE COURT:  Sure.  Take all the time that you
12    need.
13              MR. MAREK:  Your Honor, do you mind if I flip
14    through my phone at counsel table looking for something?
15              THE COURT:  No.  I don't want to see it, but go
16    ahead.  I understand.
17         I think it's important that we get to the facts of
18    the matter, so.
19              MR. MAREK:  Thank you, Your Honor.
20              THE COURT:  Thank you for asking, Mr. Marek.  I
21    appreciate it.
22              MR. JENNINGS:  May I pull the podium back a
23    little bit?
24              THE COURT:  Yeah, whatever you need to do,
25    Mr. Jennings.
```

**CROSS-EXAMINATION**

1

BY MR. JENNINGS:

2

3    Q.   Good morning.  I just want to ask, first, did you

4    write any reports or affidavits for anything about this

5    case?

6    A.   Myself?

7    Q.   Yes.

8    A.   I did not.

9    Q.   You did not?

10   A.   No.

11   Q.   Okay.  So in your testimony today you mentioned that

12   sort of evidence or post about a U-Haul; is that correct?

13   A.   Yes.

14   Q.   Was there any actual evidence that Mr. Black rented a

15   U-Haul?

16   A.   I do not recall.

17   Q.   Or any evidence that he took steps to enact that plan

18   to rent a U-Haul?

19   A.   I don't recall at this time.

20   Q.   Was there, during the investigation -- when did you

21   begin this investigation?

22   A.   Approximately a year, year and a half ago.

23   Q.   Okay.  In the year and a half that you have been

24   investigating the case, did you see any evidence that

25   there was any actual physical contact between Mr. Black

1    and any of the victims?

2    A.   Not that I recall at this time.

3    Q.   Okay.  Did you see any evidence where he attempted to

4    meet up with anybody?

5    A.   That was a minor?

6    Q.   Yes.  One of the victims involved in the case?

7    A.   Not that I can recall.

8    Q.   So as of this time, after more than a year-and-a-half

9    investigation, there's no evidence of any actual

10   arrangement to meet up on any actual plan to go and meet

11   somebody?

12   A.   I don't know that information.

13   Q.   So as far as you know, after investigating for a year

14   and a half the allegations are limited to Internet

15   communication?

16   A.   To my knowledge.

17   Q.   Okay.  So as of this time between Minor Victims One,

18   Two, Three, Four, Five, there was no evidence of any

19   physical contact.

20   A.   Not to my knowledge.

21   Q.   Okay.  To your knowledge, is there any evidence that

22   any of these victims were local?

23   A.   I don't know that information right now.

24   Q.   But you interviewed the victims.

25   A.   I, myself, did not interview them, but they have been

1   interviewed.

2   Q.   And you don't know whether any of them reside in the

3   State of Oklahoma?

4   A.   I do not know.

5          MR. JENNINGS:  Okay.  Thank you.

6          THE COURT:  All right.  Mr. Marek, any

7   follow-up?

8          MR. MAREK:  Yes, Your Honor.  So I have answers

9   to some of the Court's inquiries.

10          THE COURT:  Did you want to refresh his memory

11   with your phone, because I'm not going to give you a hard

12   time if you need to do that?

13          MR. MAREK:  Well, Your Honor I was going to say

14   that I could do that or if the Court will accept a

15   proffer.

16          THE COURT:  I will accept a proffer.  Your agent

17   didn't give us much help.  There was a lot of "I don't

18   recall, "I don't know."

19          MR. MAREK:  I'd be happy to proffer it.

20          THE COURT:  Please, proffer it.

21          MR. MAREK:  Yes, sir.

22      Your Honor, the Court inquired about whether either

23   Minor Victims One and Two were the subject of Count Three

24   Advertisement.

25          THE COURT:  Yes.

1              MR. MAREK:  And Minor Victim Two is included as

2    one of the posts that the government is alleging were the

3    advertisement count.

4         Minor Victim Two is local, and I don't want to say

5    too much about where he is.  I'll say that he lives within

6    driving distance of the defendant.

7         Minor Victim Three disclosed in his forensic

8    interview that he was 16 years of age when the CSAM of him

9    was created and disseminated.

10         Minor Victim Four disclosed that he was 11 years old

11   when the child pornography of him was created and

12   disseminated -- excuse me.  When it was created.

13         Minor victim Five, there is a statement made by The

14   Revenant in the post regarding Minor Victim Five that

15   describes The Revenant's baiting Minor Victim Five.  And

16   what The Revenant says is that it took good convincing and

17   it helps that he just turned 13, so he's still very naive.

18   The same boy wouldn't have done any of this if he's baited

19   at age 15 or 16 most likely.  And the reason he was saying

20   that is because what this 13-year-old did in Count Five is

21   expose his anus to the camera as well as take videos of

22   himself masturbating at the request of whatever Internet

23   user baited him.

24         And that would conclude my proffer, Your Honor.

25              THE COURT:  All right.  Just so we're clear you

1   were somewhat vague to me.  The Court wants to know, Minor

2   Victim Number Two, I want to know what the nature of the

3   advertisement was with respect to Minor Victim Number Two

4   as it related to Count Three.

5           MR. MAREK:  On December 26, 2021, The Revenant

6   posted to the website regarding Minor Victim Two and he

7   said, this is, and used Minor Victim's Two real first

8   name, This is Minor Victim Two from a famous TikTok family

9   account.  I baited him in 2021.  Pardon my language, Your

10  Honor.  He says, "He sucks his fingers, shakes and slaps

11  his ass, jerks and cums.  There are a lot more videos

12  included than just the ones in the thumbnails.  Enjoy!"

13      That post included links to download child

14  pornography of Minor Victim Two.  And Minor Victim Two

15  disclosed in his forensic interview that he was 13 when he

16  created that child pornography, and one of the linked

17  videos that can be downloaded from that post shows Minor

18  Victim Two in the bathroom, pulling his pants down and

19  grabbing his penis simulating masturbation.

20          THE COURT:  All right.  Thank you.

21      Mr. Jennings, did you have any follow-up that you

22  wanted to do with this Agent based on my proffer?

23          MR. JENNINGS:  No, thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Jennings.  I

25  appreciate it.

1          All right.  Mr. Marek, you may present further
2    evidence.
3               MR. MAREK:  May Agent McCourt step down?
4               THE COURT:  I'm going to see if you have any
5    future evidence first.
6          Do you have any further evidence?
7               MR. MAREK:  Oh, no, sir.  Thank you.
8               THE COURT:  All right.  May the agent step down
9    and be excused?
10               MR. MAREK:  Please.
11               THE COURT:  All right.  Agent, you're free to
12    step down.  You can stay if you would like.
13          All right.  Mr. Jennings, I believe the government
14    doesn't have any further evidence to present on this
15    matter.  I'd pleased to hear any proffers that you have or
16    any evidence that you desire to present.
17               MR. JENNINGS:  Your Honor, I have a brief
18    proffer and then argument.
19               THE COURT:  All right.  Let's go ahead and do it
20    from the podium.
21          Thank you, Mr. Jennings.
22          And I would tell both of the parties that I received
23    a pretrial services report that details the defendant's
24    ties to the family as well as his parents' residence, as
25    well as his work history.  I don't know if the parties

1   have received that or not.  If they have I will ask

2   whether or not you want me to consider that as part of

3   detention or release.  So please go ahead, Mr. Jennings.

4            MR. JENNINGS:  Yes, Your Honor.  Defense would

5   like the court to take note of probation's recommendation.

6            THE COURT:  All right.  So I will take note of

7   the entirety of the report.

8        Mr. Marek, do you any objection to that?

9            MR. MAREK:  No, Your Honor.

10           THE COURT:  All right.  So I will take the

11   entirety of the report in, so that gets you the good and

12   the bad so to speak.

13       Mr. Jennings.

14           MR. JENNINGS:  Thank you, Your Honor.

15       First, I would like to proceed by just a brief

16   proffer.  After speaking with Mr. Black's parents and

17   Mr. Black, I have learned that he attended church for

18   quite some time, and I asked Mr. Black's parents to reach

19   out to the church to see if the pastor and the deacon

20   there would write a character letter on Mr. Black's

21   behalf.  They have written two letters on Mr. Black's

22   behalf and signed both of them.

23       Pastor Gary Flynn speaks about how he's known

24   Mr. Black for over ten years.  Mr. Black is an avid

25   church-goer and that he was baptized with the church, and

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1    believes that Mr. Black is overall a good individual.

2        Mr. Dan Kirk, will be the deacon of the church, also

3    wrote a similar character letter speaking of what a nice

4    young man Mr. Black is and about he always has a good

5    attitude, and he's willing to help whenever he's needed

6    to.

7        That is Pastor Gary Flynn of the Salem Baptist Church

8    and the Deacon, Dan Kirk.

9        Mr. Black's parents would also like the Court to know

10    that they will help with transportation if released.  So

11    Mr. Black can go back to their home where they have

12    resided -- all resided for over 11 years; that they will

13    ensure that he is compliant with all court orders and bond

14    conditions.  And, again, that they will make sure that he

15    is able to make every court date.

16        And that is all for proffer, Your Honor.

17           THE COURT:  Are his parents present in court

18    today?

19           MR. JENNINGS:  Yes, they are.

20           THE COURT:  Okay.  Thank you.

21        All right.  Mr. Marek, let's go ahead and give you

22    the opportunity, since you're the movant, to argue first

23    and then we'll give Mr. Jennings a say.

24           MR. MAREK:  Your Honor, I would move for either

25    judicial notice or other recognition of the indictment in

1   addition to the pretrial services report insofar as any

2   probable cause findings on Counts, One, Two, and Three.

3           THE COURT:  I have taken that into evidence, and

4   I've also recognized that you have triggered the

5   presumption by virtue of just the indictment as well as

6   your motion to detain.

7           MR. MAREK:  Thank you, Your Honor.

8       The United States respectfully invokes the rebuttal

9   of presumption based on Counts One, Two, Three, which each

10  refer to minor victims, as well as Section 2251 of Title

11  18, United States Code.

12      I will briefly, as brief as I can, address the

13  factors in Section 3142(g) beginning with the nature and

14  circumstances of the offense charged, which was largely

15  addressed by Special Agent McCourt.  The offenses charged

16  are crimes of violence as defined by federal law, and

17  these crimes each involve a minor victim, which also

18  applies to Count Four in addition to Counts One, Two, and

19  Three.

20      3142(g)(2) addresses the weight evidence against the

21  person, and the same Section 3142, and I think it's (j),

22  refers to no evidence presented at the detention hearing

23  having anything to do with the presumption of innocence,

24  but the weight of the evidence against the person is a

25  factor for the Court to consider, and the government

1    respectfully submits the evidence against Mr. Black is
2    very strong.
3          The first thing that needs to be done is a connection
4    between The Revenant, who is probably beyond dispute,
5    engaging in production and distribution and possession of
6    child pornography by The Revenant's own admission,
7    regardless of who the identity of the person controlling
8    that count is.  There is significant evidence connecting
9    Landon Black to The Revenant account on the website
10   referred to search warrant returns, information from
11   Mr. Black's iCloud account, as well as his physical
12   devices seized during the search warrant revealed login
13   information for The Revenant, and descriptors of The
14   Revenant's activity.
15         The National Center for Missing and Exploited
16   Children have made a particular IP address the subject of
17   at least 14 cyber tipline reports as Agent McCourt
18   testified.  That is significant because when foreign law
19   enforcement source kicked off this investigation by
20   advising domestic law enforcement that a particular IP
21   address was involved on this dark website, that was the
22   same IP address that had been the subject of multiple
23   cyber tipline reports dating back, as Agent McCourt
24   testified, to 2019.
25         Section 3142(g)(3) refers to a myriad of subfactors

1    including the person's character, which no more really

2    needs to be said than the fact that The Revenant, who we

3    believe is Landon Black, was bragging about using

4    deception to victimize a series of children on the

5    Internet.  In other cases on the cyber tipline reports

6    there was information that he was disseminating child

7    pornography, and so I think that the person's character

8    does not need to be elaborated on.

9         The person's employment and, by the way, I'm not

10   addressing every single subfactor, just the ones that the

11   government finds relevant.  So I recognize the pretrial

12   services report.  I recognize its recommendation by the

13   probation office.  And so I respectfully disagree with

14   that.  I'm just going to try to cut my speech down by

15   jumping to the factors that I think are relevant.

16        One of those is the employment of the defendant.

17   This is an interesting area because the pretrial services

18   report indicate that the defendant was employed for about

19   four months at Wal-Mart most recently.  One week of

20   employment in 2019.

21        He reports that he's able to work, but after the

22   search warrant was executed at his house in December of

23   '22 and him assuming or anticipating criminal charges, he

24   lost his desire to work.

25        So not only is that an admission that Mr. Black is

1   not employed -- now, it's true that he says that he's

2   willing to work if released, but I don't think that's very

3   persuasive to the Court because Mr. Black, understandably

4   is very interested in being released and would probably do

5   a lot of things if he could be released.

6       Another reason I think that this is an interesting

7   admission on Mr. Black's part, this losing his desire to

8   work, is that a few paragraphs down on page two of the

9   pretrial services report, the defendant indicates no

10  history of mental health treatment, substance treatment

11  history, or substance abuse treatment.  The government has

12  no information about Mr. Black's use or non-use of

13  substances.  However, this is an indication of no mental

14  health concerns that is totally at odds with his being

15  so -- well, he lost his desire to work and I don't think

16  it takes much of an aggressive extrapolation to determine

17  why that is.

18      And the way that I review this admission, there is a

19  sense of futility and despair that is evoked by Mr. Black

20  in saying that he lost his desire to work.  I think that

21  the Court should consider very carefully when deciding a

22  whole bunch of other factors, including whether there are

23  any conditions that would ensure the defendant's safety if

24  he were released.

25      The defendant's length of residence in the community

1   and community ties, based on the pretrial services report,

2   the government has nothing to rebut that.  No other

3   information.

4        Past conduct.  I feel like I've already addressed,

5   which sort of goes to Mr. Black's character as well.

6        The government has no information on criminal history

7   the probation office found except for past conduct.  I

8   think the past conduct is in the detention statutes

9   because we need to be looking at what this person was

10  doing even if it didn't result in an arrest or criminal

11  charges.  And the character of Mr. Black, I haven't

12  addressed in my argument, but that did come out in

13  testimony, is the indication that he was stalking or at

14  least obsessively interested in two minor children.

15       Moving along to (g)(4), which is the nature of and

16  seriousness of danger to any person or their community

17  that would be posed by the person's release.

18       Mr. Black's father was interviewed for verifications

19  in the pretrial services report.  It indicated that he

20  said, Mr. Black's father, advised there were firearms in

21  the home.  He advised some of them are owned by the

22  defendant.  However, Mr. Black advised that all of the

23  firearms are stored in a locked safe in the home that he

24  only has the combination to.  If the Court were to accept

25  that as true, as Special Agent McCourt indicated, that was

```
 1    not the case when Special Agent McCourt was in the home.
 2    It may be true now that the items are in a locked safe,
 3    but I query whether Landon Black truly has no ability to
 4    retrieve his own weapons from his father's safe in his
 5    father's house.  The government is doubtful about that.
 6    And firearms that appear to be AR-15-style ammunition was
 7    observed by Agent McCourt as well, as well as the stalking
 8    of the obsession indication.  The nature and seriousness
 9    of a danger to any person or the community is a factor
10    that the government does submit supports detention in this
11    case.
12         Your Honor, as far as delving into that word
13    "danger," the conduct in which Mr. Black has engaged has
14    led to humiliation, trauma, reputation destruction, and in
15    other cases what he has done has led to the untimely loss
16    of life by suicide of victims, and.  I want to emphasize
17    the strict reading of "danger" to mean physical risk of
18    harm, such as that might be caused by a gun.  Restricting
19    that definition to physical harm would not be consistent
20    with the purposes of Section 3142.
21         And so I would ask Court to look at the emotional and
22    psychological harm that has been done to the victims and
23    more importantly for our purposes today, would probably
24    continue to be done if Mr. Black we're released.
25         Mr. Black committed his conduct entirely using
```

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1    Internet-accessible devices.  Mr. Jennings ably inquired
2    of the agent on cross-examination.  Was there any
3    indication that Mr. Black engaged in hands-on conduct, and
4    the answer is no.  But that -- that information cuts both
5    ways.  Because Mr. Black has shown himself to be a very
6    savvy user of technology and of the Internet.  And so
7    savvy, in fact, that he has fooled multiple teenagers and
8    teenagers using the Internet and social media are famously
9    not unintelligent.  He is fooling some of the smartest
10   users of smart devices in this country.  And Mr. Black is,
11   to his credit, appears to be very able at psychological
12   manipulation as well as technological manipulation.
13       The Court should pause in considering whether these
14   recommended conditions of release could possibly be
15   monitored in Mr. Black's case because of what we know
16   about his facility with technology.
17       Item (7)(g), avoid all contact directly or indirectly
18   with any person who is or may be a victim or witness in
19   the investigation or prosecution.
20       The government and the probation office will have no
21   practical way of making sure that Mr. Black is not making
22   contact with the victims, that he's not going to contact
23   the victims using landonlol@icloud.com.
24       This case began with Mr. Black using subterfuge and
25   false identities when he contacted people.

1        Item (7)(t) has to do with the use of Mr. Black's
2   computers, mobile device, or other devices capable of
3   connecting to the Internet.  When we had Special Agent
4   McCourt testify about the dark web traffic coming from
5   Mr. Black's residence and eventually The Revenant on that
6   website being tied to Mr. Black, that was relevant in
7   determining whether item (t) can practically be imposed on
8   Mr. Black.  Because as the Court knows, the dark web or
9   Tor network are used to hide activity, and there is no
10  reason that the government knows of to assume that
11  Mr. Black's deceptive activity on the Internet would cease
12  if he were released.  In fact, since the stakes would go
13  up significantly, quite the contrary.
14      Ditto with item (u), which concerns sexually explicit
15  conduct.  Item (v), the defendant shall have no
16  intentional [inaudibile] contact directly or indirectly
17  with any victim or minor.
18      Again, his contact with victims and minors, who he
19  turned into victims, happened on the Internet.  The
20  probation office, not even the government, not even the
21  FBI has a practical, economical way of ensuring that
22  Mr. Black abides by these conditions.
23      Of particular concern to the United States in this
24  case, what could happen if Mr. Black is released, the
25  government is concerned about the possibility of

1    destruction of evidence as the investigation is ongoing.

2    A few victims have been interviewed, but we don't know

3    whether there are other ones and whether if there are

4    other ones, they will be interviewed as well.  We do want

5    to make sure that the integrity of the investigation is

6    preserved.

7        We are concerned that Black may contact victims or

8    other families because they are anonymized in the

9    indictment and they're referred to as Minor Victims One

10   and Two and there's no reference to Three, Four, and Five.

11   But in the discovery, there are references to those

12   victims.  And more importantly, Landon Black knows who

13   these kids are.  He knows who they are.  The forensic

14   analysis of his computer showed that he kept careful

15   records of who they are, where they live, and in some

16   circumstances has occurred, as Special Agent McCourt said,

17   even more, very detailed information on these kids.

18       The United States is concerned that Mr. Black may

19   harm himself or other people or both.  He has opportunity

20   because there were guns found not only in his home, but in

21   his bedroom.  As I said before, although the crimes

22   charged in the indictment were using the Internet, at

23   least one of them lives within driving distance of Black

24   and he knows where that child is.

25       Motive.  Motive to harm himself or other people.

1    This is a young man.  He does not present as the typical

2    jail detainee or federal prisoner.  For lack of a better

3    term, he looks -- he presents to the court in a soft

4    manner.  He is facing substantial exposure to the federal

5    prison system, and suicide is the ultimate risk of

6    non-appearance, Your Honor.

7        Black's mental health, according to the pretrial

8    services report, is unremarkable, but we didn't need

9    Black's comment about lacking the desire to work to assume

10   that his mental health would have dropped off the cliff

11   after federal agents raided his house, took his devices,

12   and began to search through them.

13       What we had in this case, Black's own statement that

14   he was working at Wal-Mart, and he's capable of working,

15   and he lost his desire to work.  If he lost his desire to

16   work, and actually said that to this Court through the

17   probation office, what else has he lost a desire to do?

18   It wouldn't be the first time that somebody with no

19   criminal history, no exposure to a jail, no exposure to a

20   poison, decided to harm himself or others.

21       And in our position, there's no condition or

22   combination of conditions that would prevent him.  Where

23   there's a will there is a way, gun safe or otherwise, Your

24   Honor.

25       Your Honor, the United States respectfully submits

 1    the defendant will not be able to rebut the presumption.

 2    There's no combination of conditions that would reasonably

 3    assure Mr. Black's appearance as required and the safety

 4    of any other person in the community.  We ask that a

 5    detention order be entered on the 3142(b).

 6         Thank you.

 7              THE COURT:  All right.  Thank you, Mr. Marek.

 8         All right.  Mr. Jennings, if you'll take the podium,

 9    please.

10              MR. JENNINGS:  First, Your Honor, I would like

11    to put into context for the Court that the search warrant

12    happened in December of 2022, nearly 11 months ago.

13    Mr. Black has been out on notice of these charges ever

14    since.

15              THE COURT:  So what I'm going to ask you to do,

16    Mr. Jennings, is I'm going to allow you to reopen because

17    there's no evidence before me, as I recall, of when the

18    search warrant occurred.  Do you want to proffer that so

19    you have it in the record?

20              MR. JENNINGS:  Yes, Your Honor.  As I recall

21    Mr. Marek did mention that date of the warrant.

22              THE COURT:  Mr. Marek, did you and I missed it?

23    Did we have the evidence of the search warrant occurred in

24    December of 2022?

25              MR. MAREK:  I don't think we have the date in

1    evidence, Your Honor.

2              THE COURT:  All right.  So we'll just go ahead

3    and take it that the Court missed that, but December of

4    2022, is what I'm going to treat this for evidentiary

5    purposes when the search warrant occurred.

6         Thank you, Mr. Marek.

7         Mr. Jennings, you may proceed, sir.

8              MR. JENNINGS:  As the search warrant was served

9    in December of 2022, Your Honor, Mr. Black has been out

10   ever since.  That was nearly 11 months ago.  There's been

11   no new allegations.  There's been no evidence to suggest

12   that Mr. Black is going to harm himself.

13        As far as the lack of desire to work, I think this

14   Court can easily recognize that these charges are severe.

15   To be charged with crimes is embarrassing enough,

16   especially when allegations are this grave and serious.  I

17   think it's not abnormal for a person not to want to go

18   into a work environment after these charges have been made

19   public.

20        I'll first go and get into the seriousness and the

21   nature of the offense and the weight of the evidence.

22        I would like to point that the defense is not trying

23   to downplay the seriousness of the offense.  We know that

24   the accusations are grave.  We understand that there are

25   multiple minor victims.  We know that this is a

```
1   presumption case, so we're not trying to downplay the
2   seriousness of the allegations.
3       However, to put into context of the allegations, the
4   indictment is limited to allegations of Internet
5   communication and possession.  We understand, as we've
6   heard testimony that there were mentions of an idea to get
7   a U-Haul.  However, we've also heard testimony of evidence
8   today there was never any actual steps taken to enact such
9   a plan.  We've not heard any evidence that there was any
10  hands-on conduct or any actual meeting of Mr. Black and
11  any of the victims.
12      Again, so that the indictment is limited to Internet
13  communication, telephone communication, and possession.
14  For those reasons, we do believe that probation has the
15  resources necessary and they are capable of monitoring
16  Mr. Black's electronic devices, as well as himself with a
17  GPS ankle monitor.  And to go against weight of the
18  evidence and the nature, we do believe that probation can
19  mitigate some of this court's concerns to those factors.
20      As far as the history and characteristics of the
21  defendant and the seriousness of risk of danger, if he
22  were to be released as I proffered earlier, Mr. Black is
23  able to return home to his parents' house where he has
24  lived -- where they have all lived for over 11 years.
25  Mr. Black was born and raised in Stilwell, Oklahoma.  He's
```

1  never lived in another county.  In fact, he graduated from

2  Stilwell High School where he played on the football team,

3  ran track for the school.

4      As I proffered earlier, he has attended the same

5  church, Salem Baptist Church for over 11 years where, as

6  this Court saw, the deacon and the pastor of said church

7  wrote character letters on Mr. Black's behalf.  Mr. Black

8  again has zero criminal history.  This is his very first

9  offense.  He has zero accusations or allegations of

10  violent conduct throughout that time aside from the

11  allegations in the indictment.

12      And again, furthermore, I think most importantly, we

13  don't have to really live in a world of hypotheticals.  As

14  I stated, Mr. Black has been aware of these allegations

15  for at least since December, Your Honor.  Again, almost 11

16  months.  He has not absconded.  He has not tried to run

17  away or hide anything, and, again, he's not committed any

18  new allegations.

19      For those reasons, I think he has proven that, if

20  released, he won't continue to violate any law or violate

21  any law.  And he does have the means and resources

22  necessary to be able to come to court.  For those reasons,

23  we do leave that there are a combination of conditions

24  that could be placed on Mr. Black that could reasonably

25  assure his appearance in court and could reasonably assure

 1    the safety of the community.

 2              THE COURT:  All right.  Thank you, Mr. Jennings.

 3              MR. JENNINGS:  Thank you, Your Honor.

 4              THE COURT:  All right.  Mr. Marek, I'll give you

 5    the last word.

 6              MR. MAREK:  Two points, Your Honor.

 7         Number one, I have not reviewed the character

 8    letters.  I have no basis to dispute anything in them.

 9    Only to point out that I think the content of those

10    letters may change if the people who wrote them were aware

11    of the evidence against the defendant.  And on that note,

12    the defendant doesn't know the evidence against him

13    either.  As to Mr. Jennings's point that so long has

14    lapsed between December '22, with the search warrant and

15    today, the defendant doesn't know, he has not delved into

16    the search warrant returns of his devices, his iCloud

17    account return.  He doesn't know, though, he does not know

18    the weight of the evidence against him in this case.

19         So to assume that he knows what is coming is not

20    necessarily true, I'm sure to Mr. Jenning's point, but

21    that's all I have.

22         Thank you.

23              THE COURT:  All right.  The court is going to

24    take a brief recess.  I want to take my clerk back.  I

25    have not worked with this clerk before and I want to

1  discuss it with her and probation.  So, we will be in a

2  brief recess about probably ten minutes.

3      (Recess taken.)

4          THE COURT:  I show in this case that the basis

5  for the hearing were several grounds, but foremost of

6  importance to the Court was it was a felony involving a

7  minor victim.  That, in turn, also created this

8  presumption.  I do find that in this case the defendant is

9  entitled to a presumption of innocence and nothing in the

10  hearing nor my findings should be construed to affect that

11  presumption.

12      Under the Bail Reform Act, a defendant must be

13  released prior to trial unless I find that no condition or

14  combinations of conditions exist that will reasonably

15  assure the appearance of the defendant as required and

16  reasonably assure the safety of any other person in the

17  community.

18      In this case, the defendant has presented some

19  credible evidence to rebut the presumption and above.  He

20  has indicated that his father, who I believe is present in

21  open court, would act as a third-party custodian of him.

22  He has a significant length of time in the residence and

23  there was some substantial evidence in the pretrial

24  services report that would overcome that presumption.

25  Even though rebutted, the presumption is still a factor

1    that the Court has to consider in determining whether or
2    not the government has met its burden.

3        I find in this case, that the government has not
4    shown me by clear and convincing evidence.  I want to
5    stress, Mr. Marek, that is a high standard for the Court.
6    The government has not shown me by clear and convincing
7    evidence that there is no condition or combination of
8    conditions which will reasonably assure the safety of any
9    other person in the community.

10       A cursory review of suggested conditions of release
11   in this case, would give a lot of indications in as much
12   as we have an extremely limited ability for him to have
13   access to the Internet.  It is never a situation where we
14   can always say that it's not going to happen, but I have
15   to go with the least restrictive means available for him,
16   and there is clearly a presumption towards release once
17   that burden has been overcome to a degree.

18       So against that backdrop, the probation office has
19   provided significant conditions which would block his
20   ability to utilize the Internet.  I have his father, who
21   says he's going to act as a third-party custodian.  We
22   have electronic monitoring that is available to us that
23   will let us know should he ever leave his house, and we
24   have ability to have him under home detention.

25       While I get it, Mr. Marek, none of those are

1  absolutes.  Those are enough for the Court to essentially

2  have very little choice in this matter when I have that

3  many conditions that are available to him.

4      I also find that the government has not shown by a

5  preponderance of evidence that there are no condition or

6  combination of conditions which will reasonably assure the

7  defendant's appearance as required.

8      Mr. Marek, I want to give you the ability, should you

9  desire to appeal me, to have a ruling, so I'm going to

10  make some specific findings.  With respect to the weight

11  of the evidence against the defendant, it does appear that

12  there is substantial evidence, which would link this

13  defendant, at this time and with the evidence that was

14  presented to me at this hearing, there was no other

15  plausible individual.  Nonetheless, there appears to be

16  that the defendant has substantial evidence to suggest

17  that he's committed the offenses in the indictment.

18      He is subject to an extremely lengthy period of

19  incarceration as well as supervised release in this case

20  if he's convicted.  However, there is absolutely no shred

21  of any prior to criminal history.  There is no indication

22  that he has participated in criminal activity while on

23  probation, parole or supervision.  In fact, all of the

24  evidence is in the proceeding 11 months since this crime

25  or, excuse me, since December of 2022, the preceding

UNITED STATES DISTRICT COURT - OFFICIAL TRANSCRIPT

1  months he's not engaged in any criminal activity.  Again,

2  there was no evidence one way or the other, but I have to

3  assume that he has not.

4  There's no history of violence or the use of weapons.

5  There is no history whatsoever of alcohol or substance

6  abuse.  There is, apparently, a lack of somewhat stable

7  employment especially given that specific area where he

8  lives.  However, I do note that the government has

9  indicated that he broke with that employment at the time

10  this search warrant was, in fact, executed.  So I enured

11  that somewhat to your benefit, Mr. Marek.  He has an

12  incredibly stable residence.  He does have financially

13  reliable resources from his parents as well their

14  able-bodied nature to serve as custodians of him.  He has

15  extremely significant family ties to people within the

16  United States, and specifically within the district, and

17  more specifically within that home.

18  He is legally in the United States of America.  He

19  has absolutely no prior failure to appear in court as

20  ordered.  It appears that he has no record whatsoever.  It

21  appears there was no other prior attempts to evade law

22  enforcement in any way.

23  With respect to evidence that he will harm himself,

24  that is purely speculation at this point.  While I gather

25  that he is a young man, and it is a very serious situation

1   no one ever brought me any evidence to suggest that he had

2   given one way or the other that he was going to harm

3   himself.  I'm merely asked to conclude that because of the

4   charges he would do so.  If that was the case, everybody

5   that would come before us would essentially get that

6   presumption.  I cannot make that leap, Mr. Marek.

7       There is absolutely no evidence whatsoever that he's

8   done anything to obstruct justice in any way, shape, or

9   form after the December of 2022 search warrant in spite of

10  the fact that I can only assume that he has access to the

11  log-in information that you have.  It could very well be

12  that the government may have shut all that down, but I

13  don't have any evidence of that before me.

14      Based on all that evidence, I find that the defendant

15  should be, in fact, be released on conditions.  Let's have

16  the defendant come forward.

17      All right.  Let's go ahead and show that to them real

18  quick.  Mr. Marek, I'm going to show you a copy of the

19  conditions of release that were prepared.  There is going

20  to be two additions to that.  You can come forward if you

21  haven't received a copy of it yet.

22          MR. MAREK:  Is this for me or . . .

23          THE COURT:  I'm going to show him this copy, and

24  then I'll add to.  Your copy has the original.  I wrote

25  two things on it.  I'm going to point that out to

```
 1   Mr. Marek.
 2            MR. JENNINGS:  Thank you, Your Honor.
 3            THE COURT:  I'm going to call Mr. Marek's
 4   attention to number G(7)(g).  I have modified that to
 5   avoid all contact directly or indirectly with any persons
 6   who is or may be a victim, witnesses, investigations, or
 7   prosecution that I have written no contact with victims as
 8   dictated by the discovery in this matter.
 9        And then I also have checked (H), get medical or
10   psychiatric treatment as directed by the pretrial services
11   and sign all the appropriate release forms so pretrial
12   services can monitor compliance.
13        Again, I think if that's needed, I want him to have
14   the ability to have the United States government to help
15   him get that and that's why that was put in.  Those are
16   the only two that are different from the form that I've
17   handed you, Mr. Marek.
18        Let's give Mr. Jennings a chance to go over that with
19   his client.
20            THE COURT:  All right.  Mr. Black, in the back
21   of the courtroom, can you come forward, sir?
22        If you'll just stand there at the rail for a moment.
23        All right.  The record should reflect that
24   Mr. Jennings went over that with him since -- spent a
25   substantial amount of time reading through each and every
```

1    one of those items that's listed on the additional

2    conditions of release.  First and foremost, has your

3    client had the opportunity to read those conditions of

4    release, Mr. Jennings?

5              MR. JENNINGS:  Yes, Judge.

6              THE COURT:  Mr. Black, have you had the

7    opportunity to read those conditions of release?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Sir, do you have any questions

10   whatsoever about those conditions of release at this time?

11       If you do, I'm going to give you the opportunity to

12   discuss it with Mr. Jennings because you do not want to

13   have any questions on those conditions when it comes time

14   for the Court to make inquiry as to whether or not you

15   have violated them.  So do you need any time to discuss

16   any of those conditions with Mr. Jennings?

17             THE DEFENDANT:  No.

18             THE COURT:  Do you think that you understand

19   them?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  You've read all of them?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  All right.  Mr. Jennings.

24             MR. JENNINGS:  Your Honor, we would like a copy

25   for him.

1          THE COURT:  He will get one.

2      All right.  With that, Mr. Black, we're going to

3  release him.  He is going to be placed in your custody.

4      Do you agree to take that custody of him?

5          MR. BLACK:  Yes, sir.

6          THE COURT:  All right.  I want Mr. Black to

7  receive a copy of that as well.  I'll give him this one.

8      Go ahead, Mr. Jennings.  I'm sorry.

9      Has he executed the bond in this case?  Has the

10  defendant signed the paperwork?

11          MR. JENNINGS:  Yes, Your Honor.

12          THE COURT:  Can you return that to the Court,

13  please?

14      In addition to that I'm going to order him released

15  on a $10,000 unsecured bond in this matter. He'll need to

16  authorize that and sign it if he has not done so.

17      I've been handed the declarations as well as the

18  conditions of release, which the defendant has executed.

19  I'm signing that as well as the appearance bond in this

20  matter.

21      The defendant will be notified of his next court

22  appearance in this matter via Mr. Jennings.  Returning

23  that to the court clerk.

24      Now in a minute Mr. Marek is going to have the floor

25  and he may very well appeal my decision, which may prevent

1   you from not being released at this time, but the law is,

2   is that the appeal will need to be heard promptly.  So I

3   wanted to not give you a false sense of hope.

4       Mr. Black, you can have a seat, sir.  We'll make sure

5   that you have those conditions.

6       All right.  Mr. Marek, what's your pleasure, sir?

7           MR. MAREK:  Your Honor, I expect the government

8   will pursue an appeal and we respectfully ask that the

9   order be stayed.

10          THE COURT:  Okay.  I don't think I have any

11  choice, but I want to make sure that we're on the same

12  page pursuant to the local criminal rules, Mr. Marek.  I

13  think by 5:00 today you have to have that appeal on form

14  and something on file with that.  So take a look at the

15  local rules, because my order will be stayed until 5:00

16  unless that isn't done.

17      You've got enough time today.  I believe the rule

18  says or the order says if we're close to 5:00 you get

19  until the next morning to do something perfunctory, but we

20  have almost six hours until 5:00 today.  So I will stay it

21  until 5:00.

22      So what that means to you, Mr. Black, is that you

23  will not be released at this time.  Mr. Marek desires to

24  appeal my decision to the next judge.  If he doesn't have

25  something on file by 5:00 today I will lift that stay.

1        And, Mr. Marek, it's been a while since I've looked

2   at that rule, and it's been a while since I've used that

3   rule.  So if I'm incorrect, please let the court know

4   immediately upon email to the Court as well as,

5   Mr. Jennings.

6        All right.  Anything further, Mr. Jennings?

7             MR. JENNINGS:  No, Your Honor.

8             THE COURT:  All right.  Anything further,

9   Mr. Marek?

10            MR. MAREK:  No, Your Honor.  Thank you.

11            THE COURT:  All right.  With that, we'll be in

12  recess.

13

14            (RECORDING CONCLUDED AT 11:00 a.m.)

15                 **CERTIFICATE OF REPORTER**

16        I certify that the foregoing CERTIFIED TRANSCRIPT

17  is a transcription of all requested matters contained on

18  the recorded proceeding.

19  DATE:    November 3, 2023

20

21  /S/ Shelley Ottwell, RPR
    Shelley Ottwell, RPR, CSR
22  U.S. STENOGRAPHER

23

24

25

UNITED STATES DISTRICT COURT – OFFICIAL TRANSCRIPT